57 CCPA

**Application of Albert BEZOMBES, Ivan Peyches and Pierre Tissier.**

**Application of Albert BEZOMBES, Ivan Peyches and Pierre Tissier.**

**Patent Appeal Nos. 8226, 8244.**

United States Court of Customs and Patent Appeals.

Feb. 5, 1970.

John L. Seymour, Bauer & Seymour, New York City, attorneys of record, for appellants.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents; Fred W. Sherling, Washington, D. C., Raphael Vincent Lupo, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and RAO, Chief Judge, sitting by designation.

RICH, Acting Chief Judge.

These two appeals are from decisions of the Patent Office Board of Appeals affirming the rejections of claims in appellants' applications serial Nos. 261,034 (Appeal No. 8226) and 261,098 (Appeal No. 8244). The applications, both filed on February 26, 1963, are entitled, respectively, "Process For The Shaping And Supporting Of Glass" and "Apparatus For The Support And Transportation Of Glass." Although only method claims are involved in Appeal No. 8226 and only apparatus claims in Appeal No. 8244, the disclosures in the two applications are apparently identical and the two appeals were argued as one and are dealt with in this single opinion.

The inventions relate to the manufacture of "flat glass," which term is said to include all sheet glass products, whether flat or curved. Applicants state that it was known to deposit glass, either in the molten state or already formed into a sheet but in the plastic state, over a support in the form of a bath of liquid having a greater density than the glass, molten metal for example, whereby the glass was maintained at the surface of the bath by hydrostatic forces. That proc-

ess, which is known as the "flotation process," is stated to have certain disadvantages, including the requirement for greater quantities of liquid metal to fill the bath-containing tanks. Among the stated objects of appellants' invention are:

* * * to support flat glass in the plastic state on capillary films of molten metal, on flowing sheets of molten metal, on thin, immobile sheets of molten metal, and on a plurality of bodies of molten metal of no great thickness.

Illustrative of the specific disclosure of the applications are Figs. 1, 2 and 3 thereof.

FIG. 1

FIG. 2

FIG. 3

[A1084]

Fig. 1 shows a sheet of glass 1 supported above the flat surface of a floor 3 by what is described as a "capillary" layer of molten metal 2. The entire floor 3 may be of a material which is not wetted by the molten metal, as carbon, preferably in the form of graphite. If desired, a central section 3′ of the floor may be made of a material which is wetted by the molten metal, only the outer portions 3″ being made of a material which is not wetted by the metal. It is stated that in either case the capillary sheet of molten metal assumes a form having rounded edges 4 and supports the glass sheet out of contact with the floor.

Fig. 2 differs from Fig. 1 in that the floor 3 is provided with a central trough 5 which receives a thin sheet of metal 2, present in sufficient quantity to project above the level of the floor and form "capillary curves 7." The trough is of material not wetted by the metal.

In Fig. 3, a refractory block 15 has, on its upper surface, a shallow central trough providing a floor 3 on which is disposed a film or layer 2 of molten metal such as tin for supporting a glass sheet 1. The trough has raised edges which contain the molten metal on three sides and a weir 8 on the downstream side. (Glass flow is from left to right.) The weir stabilizes the thickness of the film or layer of molten metal, such metal as flows over it passing through conduit 12, pump 13, and conduit 12′ to the up-

stream side of the trough. A sheet of glass 1 coming from rollers on the left (not shown) is laid on the molten metal and progresses through a temperature-reducing lehr from which it is drawn off onto rollers 10. The temperature of the floor is controlled at different parts of its length by "thermal pipes" 16. By maintaining an even flow of molten metal over the weir, the under surface of the glass is kept out of contact with solid objects until it has been cooled to a viscosity at which it is not marred by contact with ordinary handling means such as metal rollers.

In addition to disclosing molten metal in the form of a continuous sheet, as shown in Figs. 1 and 3, the applications reveal a number of modifications. Thus, a series of pits or grooves spaced over the surface of the floor may be overfilled with molten metal in sufficient amount to extend slightly above the level of the floor to sustain the weight of the glass sheet. It is stated that such construction provides "what is in effect a plurality of liquid bearings which support the sheet out of contact with the floor. * * *." Another embodiment provides spaced shallow "trays" or cavities in the floor along the path for the glass sheet, which trays are overfilled with molten metal to form supports for the glass sheet.

Additionally, it is disclosed that "gases such as hydrogen" or "argon and nitrogen" may be introduced beneath the glass sheet to prevent oxidation of the molten metal and protect the surface of the glass. Reference is also made to "introduction of inert, antioxidant or ion inhibiting gases."

In comparing their inventions with the prior art, appellants state that, in systems using deep flotation baths, the glass sheet must be lifted from the horizontal plane to a higher level to avoid contact with the borders of the tank as it leaves the bath, requiring sharp chilling of the sheet at that point to prevent the change in direction from introducing surface deformations. They further state:

That disadvantage of the prior art is overcome in the present invention by the use of the surface tension to sustain the glass sheet on a solid floor. Substantially speaking, it is the force of surface tension which support[s] the glass in some phases of this invention. In the present invention, the glass may be drawn horizontally from the surface of the liquid support, thus avoiding the internal and surface displacements which occur when the glass is bent to raise it to the level of a higher conveyor * * *.

*Appeal No. 8226*

In this appeal, claims 1–3, 5–14, 16, 22, and 27 stand rejected on prior art. These claims also were rejected, along with claims 23 and 26, the only other claims in the application, for double patenting.

Claims 1, 2, 11, 12, 16, and 27 are representative:

1. In a method of making flat glass wherein a sheet of flat glass is formed from molten glass and is deposited on and moved over the receiving floor of a solid bed, the step which comprises interposing between the sheet and the floor a support of molten metal of thickness measured above the floor not substantially greater than that of the glass sheet, not larger than the glass sheet, and so disposed as to separate the sheet from the floor, cooling the sheet progressively as it advances over the floor until it can be handled without damage by other handling means, and transferring the glass to other handling means.

2. In a method of handling flat glass wherein a sheet of flat glass is deposited on and moved over a receiving floor forming part of a solid bed, the step which comprises interposing between the sheet and the floor a support of molten metal of thickness measured above the floor not substantially greater than that of the glass sheet, and so disposed as to separate the sheet from the floor, cooling the sheet

and transferring the glass to other handling means.

11. In a method of supporting a sheet of glass at high temperature on a plurality of oxidizable molten metal bearings ["the step"?] which comprises introducing a protecting gas, of the type comprising neutral and reducing gases, between the bearings.

12. The method of casting flat glass which comprises forming a sheet from molten glass, forming a sufficient quantity of molten noncapillary metal in a state of equilibrium between the forces of surface tension and the forces of gravity to receive and support the glass sheet, laying the glass sheet upon the molten metal and moving it thereover, cooling the glass sheet in contact with the molten metal, and

transferring the sheet to other supporting means.

16. A method of transporting a glass sheet in a plastic state in which the glass sheet is deposited on a solid surface which comprises interposing between said solid surface and the glass sheet a liquid film acting as lubricant for facilitating the gliding of the glass sheet on said support.

27. A method of supporting a surface of an object out of contact with a floor which comprises establishing a thin support of molten metal, which does not wet the said surface and does not wet the floor, between the surface and the floor to a depth which just lifts the surface clear of the floor.

The references relied on by the board are:

| Hitchcock | 789,911 | May 16, 1905 |
| Coxe | 2,298,348 | Oct. 13, 1942 |
| British Patent | 874,534 | Aug. 10, 1961 |

Hitchcock discloses a method of manufacturing glass best described with reference to Fig. 2, a cross-sectional elevation of his apparatus.

FIG.2.

[A1083]

In the figure, plastic glass in chamber 1 flows through a slot 3 into chamber 4 in which it is hardened and annealed. In that chamber, the sheet of glass is supported on "a practically continuous" bed 5, formed of liquid metal having a melting point lower than the temperature of the glass sheet and a specific gravity greater than that of the glass, so that the sheet will float on the surface of the molten metal. The tank holding the molten metal bath 5 is divided into a series of compartments by the partitions 6 which "extend nearly to the surface of the liquid bed and have their upper edges reduced to nearly knife-edges * * *." These partitions substantially prevent movement of metal from one compartment to another and the compartments can be maintained at progressively lower temperatures to gradually cool the glass. Electric resistance heaters are shown at 7.

Arranged downstream of the chamber 4 is an auxiliary chamber 13 in which the annealing of the sheet is completed. The

auxiliary chamber 13 is provided with a liquid bed which "is preferably formed of mercury." The bottom or "floor" of chamber 13 is provided with ribs or ridges, which prevent "any such movement of the liquid bed as would tend to produce uniformity of temperature at the ends of the bed."

Coxe discloses an arrangement for forming sheet metal, aluminum for example, on the top of a molten bath of a metal, such as lead, having a lower melting point and a higher specific gravity than the metal being so formed. To prevent the molten metal of the bath from attaining a higher temperature than desired, it may be drawn off at the downstream end and passed through a pipe and cooler back to the upstream end.

The British patent discloses a method of producing glass sheet wherein the sheet is supported on a bed of carbonaceous material or on rollers of such material. The supporting material or rollers may be protected from deterioration by a nonoxidizing atmosphere of a gas such as pure nitrogen "which does not react with heated carbon at the temperatures involved * * *."

The board sustained the rejection of claims 1–3, 5–8, 12–14, 16, 22, and 27 on Hitchcock in view of Coxe, relying principally on Hitchcock. It reversed a similar rejection of claims 23 and 26. It also sustained the rejection of claims 9, 10, and 11, stated by the examiner to be on Hitchcock in view of Coxe further in view of two other patents and the British patent, the board relying only on the British patent.

Appellants emphasize that the Hitchcock process is a flotation process wherein the glass sheets actually float on the molten metal of the bath. They urge that their method is fundamentally different and involves supporting the glass "in a state of equilibrium between the forces of surface tension and gravity." The board, they state, erred in assuming that Hitchcock's flotation bath is in a state of equilibrium between the forces of surface tension and gravity. They urge that the board also erred in assuming that mercury, proposed by Hitchcock for the bath in his auxiliary chamber 13 could be used, contending to the contrary that mercury vaporizes at 357°C. and "would have become a gas before the hot sheet actually touched it."

Turning to claim 1, quoted above, appellants urge that Hitchcock does not show an organization in which a sheet is deposited on a solid floor and moved over it or in which there is interposed between the sheet and the floor a support of molten metal "of thickness measured above the floor not substantially greater than that of the glass sheet" and "not larger than the glass sheet." They further contend that a flotation bath must be larger than the sheet it supports and that the molten metal support recited in the claim therefore cannot be a flotation bath. Concerning this claim, the board said:

* * * we read the bottoms of beds 5 and the bottom of the mercury bed in chamber 13 of the reference as being floors. In fact, Hitchcock describes the latter as "floor" in line 16 on page 2. We note also with respect to the floor of beds 5 of the reference, which are slightly curved, that the term "floor" as used in the claims before us need not be a flat horizontal surface or any other particular configuration unless the claims so specify. This is in accord with applicants' terminology, as exemplified in claim 22 which recites that "the floor is curved."

Claim 1 recites that the support of "molten metal is of a thickness measured above the floor not substantially greater than that of the glass sheet, [not] larger than the glass sheet." Limiting the support of molten metal to the size of the sheet to be supported in Hitchcock is an obvious matter of choice. The relative thickness of the molten metal to the glass sheet, as broadly recited in this claim need not transcend the flotation principle of Hitchcock. Using just enough molten

metal or mercury in this reference to just float the glass sheet, which would be but an obvious expedient, would substantially meet the claimed relationship.

The limitation in claim 1 that the support of molten metal is "not larger than the glass sheet" seems significant in distinguishing over Hitchcock where the glass sheet floats on the molten metal and, as shown in Fig. 1 of the patent (not reproduced herein), the lateral edges of the glass sheet are spaced inwardly a substantial distance from the lateral edges of the bath. The board's dismissal of the feature as "an obvious matter of choice" is not convincing in the absence of some reason why a person skilled in the art would find it obvious to depart from the flotation type of support of Hitchcock as well as from his dimensional disclosures. The rejection of claim 1, and claim 22 which is dependent thereon, will not be sustained.

Claim 2, supra, differs from claim 1, as may be seen, in referring merely to a "sheet of flat glass" without requiring that it be molten or otherwise specifying its temperature, and in not specifying that the molten metal support is not larger than the sheet. We think the board was correct in upholding the rejection of that claim. A "floor" need be no more than "The lower inside surface of any hollow structure"[1] and we think that term is applicable to the bottom of Hitchcock's chamber 13. Mere selection of a "thickness measured above the floor not substantially greater than that of the glass sheet" would not by itself preclude the use of a bath deep enough to support the sheet by flotation or limit the method to one in which the molten metal provides the principal support for the sheet through surface tension. While appellants' argument that mercury vaporizes at a relatively low temperature indicates that the mercury in chamber 13 of Hitchcock would not be suitable for supporting glass in molten or plastic condition, the solicitor points out that in Hitchcock's process the glass sheet is cooled before it reaches the mercury bed. It cannot be concluded, on the present record and arguments, that the temperatures of the bath in Hitchcock's chamber 13 would be such as to make it inoperative for its disclosed purpose of completing the annealing of the glass sheet. Accordingly, the rejection of claim 2 will be sustained.

Claim 6 depends from and adds to claim 2 the limitation of "flowing a continuous sheet of molten metal beneath the glass sheet between the sheet and the floor," such flowing of the metal support being disclosed in connection with appellants' Fig. 3 as described above. The mercury bed in chamber 13 of Hitchcock, relied on with respect to claim 2, does not satisfy this limitation since it is clear that the mercury is placed in its chamber before the glass sheet is deposited and there is no "flowing" of it as a "continuous sheet" between the glass sheet and the floor during the movement of the glass sheet. Rather, the mercury acts as a substantially stationary flotation bed in which the ribs or ridges in the floor "prevent any such movement * * * as would tend to produce uniformity of temperature at the ends of the bed." It also seems apparent that Coxe would not lead one skilled in the art to act contrary to this express teaching by flowing the mercury along the bed. The rejection of claim 6 is reversed.

Claim 3 also depends from claim 2, adding the limitation that the molten metal support "is noncapillary and supports the glass by surface tension." The board stated that the mercury employed for the "floating liquid" in Hitchcock "will inherently form a convex meniscus with the edges of the compartment since the liquid must fill the latter * * *."[2]

1. Webster's New International Dictionary, Second Edition, Unabridged, 1954.

2. Hackh's Chemical Dictionary (3d Ed.) contains these definitions:

*capillarity*—The attractive force between two unlike molecules as shown by the wetting of a solid surface by a liquid, or by meniscus formation.

It also commented that the claim "does not exclude buoyant force in addition." However, the claim sets forth the feature of support by surface tension emphasized in appellants' specification and the board's comments are not supported by any evidence that surface tension is a substantial factor in the flotation type of supporting beds of Hitchcock. The rejection of claim 3, and claim 5, dependent therefrom, will not be sustained.

Claim 7 depends from and adds to claim 2 the provision that "the metal support comprises a plurality of molten metal bearings." The board regarded the two molten metal baths of Hitchcock as a plurality of metal "bearings" while appellants seem to consider the term "liquid bearings" limited by their disclosure to an arrangement offering "meniscus supports" for the glass sheet. The board's position cannot be sustained, for one reason, because the claim requires that the plurality of metal bearings, however that term is construed, which make up the support be interposed between "a" receiving floor and the sheet whereas the molten baths 5 and 13 of Hitchcock are each on a separate "floor." Moreover, the Patent Office does not suggest that it would be obvious to modify the reference structure to meet the requirements of the claim. The rejection of claim 7 is reversed.

Claim 8 is independent and includes steps of *flowing a thin sheet* of molten metal over a supporting solid surface and laying a sheet formed from *molten* glass on "the flowing molten metal." The board held that claim readable on Hitchcock "wherein the mercury bed in chamber 13 is 'a thin sheet of molten metal,' which has been flowed into the chamber." However, Hitchcock does not disclose that glass in a molten condition is received in chamber 13 and appellants' contention that mercury would vaporize upon contact with glass at high temperature stands unrebutted with respect to glass at a temperature high enough to

be molten. Also, for reasons apparent from our discussion of claim 6, the recitation of laying the glass sheet on the *flowing* molten metal is not only unsatisfied by the reference but is also contrary to its teaching. We therefore cannot sustain the rejection of claim 8 on the basis of Hitchcock's chamber 13 with its mercury bath. As to chamber 4 of Hitchcock which receives the molten glass, the solicitor commented at oral argument that he would not call the molten bath therein a "thin sheet," and we agree. The board did not suggest any reason why it would be obvious to modify the bath in chamber 4 to support molten glass on a thin sheet. In addition, the bed in chamber 4, like the mercury in 13, is restrained from flowing movement. The rejection of claim 8 will not be sustained.

Claim 12, supra, requires casting a sheet from molten glass and laying the sheet on molten metal "in a state of equilibrium between the forces of surface tension and the forces of gravity to receive and support the glass sheet * * *." Claim 13 is similarly limited. While the board states that the "mercury in the reference," which mercury is in Hitchcock's chamber 13, is in the defined state of equilibrium, it does not explain how it reaches that conclusion. Appellants urge that the board erred in assuming that such equilibrium exists in the Hitchcock flotation bath and further state:

> Our invention deals with "casting" flat glass by forming a sheet from molten glass and depositing it upon molten metal in a state of equilibrium between the forces of surface tension and gravity.

Because the mercury bath would vaporize if a molten sheet of glass were cast thereon, it plainly could not be used as the supporting means of these claims. Further, the record does not satisfy us that the recited condition of equilibrium would be attained when glass is floated

---

*meniscus*—The crescent-shaped surface of a liquid in a tube, either concave (when the liquid wets the material of the container, as water and glass), or convex (when liquid does not wet, as mercury and glass).

on a metal bath as disclosed in Hitchcock. The rejection of claims 12 and 13 will not be sustained.

Claim 14 includes the requirement that molten flat glass be cast onto the upper surface of

> \* \* \* an elongated bed of molten metal, which does not wet the glass, in a shallow trough which is not wetted by the molten metal, to a depth which lifts the surface of the metal above the upper level of the trough \* \* \*.

In Hitchcock, only the molten metal in tank 4 is disclosed as suitable for receiving molten glass and there is no disclosure that the tank is not wetted by it. Neither is it disclosed that the metal there is in a shallow trough to a depth which lifts the surface of the metal above the upper level of the trough which, as appellants disclose, permits the glass sheet to pass over the edge of the trough without being bent upwardly from the horizontal plane. The board decision affirming the rejection of claim 14 will not be sustained.

The essence of claim 16, supra, lies in interposing between a *solid* supporting surface and a glass sheet *"in a plastic state"* (our emphasis) a "liquid film" acting as a "lubricant" for the sheet. While Hitchcock floats a glass sheet in what is apparently a plastic state on the molten metal bath in chamber 4 and points out that there is "practically no frictional resistance to the movement of the sheet," the patent makes no suggestion of the use of a "film," which would obviously be too thin to *float* the sheet in accordance with its disclosure. Consequently, the record does not warrant sustaining the rejection of claim 16.

Claim 27, supra, is conceded by appellants to be "very broad." The surface of "an object," which need not be heated, is supported by establishing a "thin support of molten metal" between the surface and the floor "to a depth which just lifts the surface clear of the floor." The board took the position that using just enough mercury in Hitchcock's chamber 13 to float the glass sheet is "a desideratum obvious even to the uninitiated." We take it that the board considered such modification obvious to a person of ordinary skill in the art and we agree. While appellants state that mercury "might well wet the tank in which it reposes depending on what the tank is made of," we do not think the person skilled in the art would find it unobvious to use mercury as a supporting bath under conditions where it wets neither the surface of the object nor the chamber in which it is disposed. We will sustain the board as to this claim.

Claims 9, 10, and 11 define methods of protection or support of glass on molten metal bearings and differ principally in their definition of the gas used to protect the glass or molten metal bearings. In claim 11, the gas is designated "a protecting gas, of the type comprising neutral and reducing gases." We think the British patent's disclosure of protecting heated bearings from oxidation by means of a nonoxidizing atmosphere such as nitrogen gas would make it obvious to employ such a gas with other heated bearings in the art, e. g., the molten metal baths of Hitchcock which in our opinion meet the expression "molten metal bearings" broadly.[3] Noting that the claims in this group do not require that there be a plurality of bearings on a single floor, we agree with the board that claim 11 is unpatentable over the prior art. On the basis of this record, we further agree with the solicitor that hydrogen, although a reducing rather than simply a nonoxidizing gas, would obviously be suitable for preventing oxidation. We therefore think that claim 9, which is directed to the use of hydrogen, was also properly rejected.

On the other hand, claim 10 calls for protecting glass in contact with "molten ionizable metal bearings" by suffusing the area of contact with "a gaseous in-

---

3. A "bearing" is defined as "An object, surface or point that supports." Webster's New International Dictionary, Second Edition, Unabridged, 1954.

hibitor of ionization." We do not see how the use of a gas as an inhibitor of ionization would be obvious from the British patent and will not sustain the rejection of claim 10.

The double patenting rejection of the method claims in this appeal was grounded on the statement that these claims "are not patentably distinct from the inventive concept claimed in" application serial No. 261,098, involved in companion Appeal No. 8244. However, the board has commented in response to an inquiry by appellants that it sees no reason why the allowable method and apparatus claims in the two applications cannot issue *in a single patent*; appellants state they have no objection to such procedure; and the solicitor states there is no need to consider the double patenting rejection. Under these circumstances, we will remand this case for implementation of the procedures proposed above.

*Appeal No. 8244*

■■ Involved in this appeal are apparatus claims 12, 13, 22, and 28, of which claims 12, 22, and 28 are the independent claims. They are:

12. Apparatus for the support and transportation of flat glass in a plastic state which comprises supporting means having a floor adapted to carry a sheet of glass, molten metal on the floor disposed in a thin sheet to furnish support to a glass sheet substantially throughout the length and breadth of the part thereof which is to be supported out of contact with the floor, means to lay a sheet of plastic glass on the molten metal, and means to move the sheet over the floor.

22. Apparatus for handling moving flat sheet material which comprises a floor and liquid bearings thereon mounted in depressions in the floor and projecting above the level of the floor in a state of balance between the forces of surface tension and gravity.

28. Apparatus for handling flat glass which comprises a substantially continuous, solid floor adapted to carry a sheet of glass, and a substantially continuous liquid bearing layer interposed between the solid floor and the glass, said layer consisting essentially of molten metal in sheet form having lateral dimensions which furnish support substantially throughout the main body of the glass sheet and vertical dimensions which provide lateral boundaries above the floor level.

The board regarded the examiner's position to be that claims 12, 22, and 28 are unpatentable over Hitchcock under 35 U.S.C. § 103 and that claim 13 is unpatentable over Hitchcock in view of Coxe under 35 U.S.C. § 103. Hitchcock and Coxe are the same patents applied in Appeal No. 8226.

The board was of the view that a "thin sheet" of molten metal as defined in claim 12 "does not have any definite thickness as to distinguish over the thickness of Hitchcock, particularly from the mercury bed in chamber 13" of that patent. However, the mercury bed in Hitchcock is not disclosed as receiving the glass in a plastic state as required by claim 12 and, as already discussed, mercury appears to vaporize at too low a temperature to support plastic glass if it were laid on the bed. It is true that the molten metal bath in chamber 4 of Hitchcock does receive glass in the plastic state. But, as pointed out in our consideration of claim 8 in Appeal No. 8226, that bath is not a "thin sheet" and the board has not pointed out any reason why it would be obvious to substitute a thin sheet of molten metal for the bath. The rejection of claim 12, and claim 13 dependent thereon, will not be sustained.

In treating claim 22, the board considered the molten metal in chambers 4 and 13 as the liquid "bearings" and stated that, "particularly when the liquid is mercury, the 'bearings' would inherently form a meniscus with the rims of the depressions and extend centrally above the level of the rims." However, the claim recites "a" floor and the "bearings" are defined as "mounted in de-

pressions in the floor and projecting above the level of the floor in a state of balance between the forces of surface tension and gravity." Not only must the two metal baths in chambers 4 and 14 in Hitchcock be regarded as mounted in separate "floors" but we also are not satisfied from the present record and arguments that they meet the requirements of the last quoted expression regarding the relationship of surface tension and gravity. The board's affirmance of the rejection of claim 22 on the prior art of record will not be sustained.

As to claim 28, appellants urge that the Hitchcock apparatus "has no floor which could carry a sheet of glass" and that the molten metal of Hithcock cannot be called a layer. We do not agree. The chambers for both metal baths have "floors" and carry sheet glass through the medium of the metals. The mercury bed is shown as relatively thin and flat and, in our opinion, may be considered a layer of metal in sheet form. In any event, it would appear to be obvious to make that bath as thin as practical while still floating the glass. While the claim also includes express references to the dimensions of the layer, appellants have not demonstrated how the terminology employed distinguishes over Hitchcock. The board's action in affirming the rejection of claim 28 will be sustained.

### Summary

In Appeal No. 8226, only the rejection on prior art is considered and as to that rejection, the decision of the board is affirmed as to claims 2, 9, 11, and 27 and reversed as to claims 1, 3, 5–8, 10, 12–14, 16, and 22. The decision in this appeal is modified and the case remanded for further proceedings consistent with this opinion.

In Appeal No. 8244, the decision of the board is affirmed as to claim 28 and reversed as to claims 12, 13, and 22.

Modified and remanded.